**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION**

| | |
|---|---|
| PULTEGROUP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action: |
| ) | **Jury Trial Demanded** |
| JDI DATA CORPORATION, ) | |
| JAMES DEROSA, JOSEPH ) | |
| WOLCZANSKI, and CHRISTINE ) | |
| ERWIN, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**

Plaintiff, PulteGroup, Inc. ("Pulte"), sues Defendants JDi Data Corporation ("JDi"), James DeRosa ("DeRosa"), Joseph Wolczanski ("Wolczanski"), and Christine Erwin ("Erwin"), (collectively, JDi, DeRosa, Wolczanski, and Erwin, are the "Defendants") and states as follows:

**NATURE OF THE ACTION**

1. This is an action to recover damages resulting from the Ponzi scheme perpetrated by the Defendants against Pulte.

2. In 2015, Pulte engaged JDi, a claims management firm, to manage the cost administration of hundreds of construction defect lawsuits. As part of its cost administration, JDi received, on behalf of Pulte, millions of dollars from various insurance carriers who owed defense and indemnity obligations to Pulte (the "Pulte Insurance Funds").

3. JDi was obligated to maintain the Pulte Insurance Funds in individual trust accounts, segregated by claim (the "Pulte Trust Accounts"), and disburse the Pulte Insurance

Funds for litigation expenses as approved by Pulte and its third party administrator, Gallagher Basset ("GB").

4. In or about March 2022, JDi's principal, DeRosa, confessed to Pulte that over the past six to seven years he and JDi had been converting the Pulte Insurance Funds, using them to cover JDi operating expenses and for other unauthorized uses. In other words, JDi, at DeRosa's direction, began years ago to take the Pulte Insurance Funds from the individual, segregated Pulte Trust Accounts and used them to unlawfully fund other accounts, including trust accounts for other clients of JDi and JDi's corporate operating accounts. In efforts to conceal the fraud over that extended time period, JDi created and distributed false account statements to Pulte – statements that did not reflect the true amount of money in the pertinent accounts.

5. In May 2019, in an effort to facilitate its conversation of the Pulte Insurance Funds, DeRosa directed the transfer of all of the Pulte Insurance Funds to a bank account owned and controlled by JDi, without Pulte's knowledge or authorization. Once the transfer was complete, JDi and DeRosa unlawfully used the Pulte Insurance Funds to pay unauthorized corporate and personal expenses.

6. As a result of JDi and DeRosa's unlawful conversion, Pulte has been deprived of approximately $2.7 million in insurance proceeds.

7. In addition, Pulte has incurred approximately $320,000 in legal expenses and costs to investigate and expose this scheme.

**PARTIES, JURISDICTION AND VENUE**

8. Pulte is a Michigan corporation with its principal place of business in Atlanta, Georgia. Pulte is one of the nation's largest homebuilders, with operations in over 40 major metropolitan areas.

9. JDi is a Florida corporation with its principal place of business in Coconut Creek, Florida. JDi purports to be a claims management and software development company with about thirty employees, providing cost management of insurance and legal claims.

10. DeRosa is a resident of Broward County, Florida and is otherwise *sui juris*. DeRosa is the Chairman and Founder of JDi. DeRosa is the owner of JDi.

11. Wolczanski is a resident of Broward County, Florida and is otherwise *sui juris*. Wolczanski is the Chief Executive Officer, and previously the Chief Financial Officer, of JDi. Wolczanski was an account signatory or holder on at least one of the JDi corporate accounts that received funds unlawfully taken from Pulte Trust Accounts. As an account signatory, Wolczanski was authorized to operate JDi's corporate account and had knowledge of the unlawful trust fund activities in that account, and likely in other JDi corporate accounts. He therefore was involved in, and substantially assisted, JDi and DeRosa in their scheme to convert Pulte trust account funds for operational and other uses.

12. Erwin is a resident of Broward County, Florida and is otherwise *sui juris*. Erwin is the Director of Vendor Cost Control™ and oversees JDi's operations and client relationships. She was assigned as a claims manager to many of Pulte's accounts. Erwin was intimately involved in the day-to-day administration of the Pulte trust accounts and, therefore, knew, or should have known, of JDi's unlawful transfers and misuse of the Pulte Insurance Funds.

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Pulte is a citizen of either Michigan or Georgia, and Defendants are citizens of Florida.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district

and, under 28 U.S.C. § 1391(c), because the Defendants are subject to personal jurisdiction in this judicial district.

15. All conditions precedent to the filing and maintenance of this action have been performed, have occurred or have been waived prior to the commencement of this action.

## FACTS COMMON TO ALL COUNTS

### A. The parties' relationship and agreements

16. In 2015, Pulte and JDi entered into a contractual agreement in which JDi agreed to provide Pulte third party cost administration services. This agreement was memorialized in a series of e-mails and later in a Master Services Agreement executed by Pulte and JDi on July 7, 2020 (the "Agreement"). A true and correct copy of the Agreement is attached to the Complaint as **Exhibit "1"**. Exhibit B to the Agreement sets forth in detail the cost administration services provided by JDi and the process by which JDi provided such services.

17. Given the large national scale of its homebuilding operations Pulte is forced to regularly defend, on behalf of its affiliates, construction defect claims asserted by homeowners and homeowner associations.

18. Pulte is required to be named as an additional insured on each commercial general liability policy issued to its subcontractors. When a construction defects claim is initiated against Pulte (or one of Pulte's affiliates), Pulte tenders the defense and indemnity of the case to the individual subcontractors, and their insurance carriers, whose work is implicated in the allegations of the claim.

19. Upon receipt of a construction defect claim, Pulte generally funds and pays for the cost of its own legal defense until the insurance carriers for the respective subcontractors (the "Insurance Carriers") accept the tender of defense and begin to pay Pulte's defense costs. The

Insurance Carriers' funds are used to pay legal fees, experts and other vendors involved in the construction lawsuits.

20. Once there was a tender of the case to the Insurance Carriers, the defense firm handling the lawsuit for Pulte creates a budget of legal, expert and vendor fees for approval by Pulte and GB. That budget is then used to determine the amount to be paid by each Insurance Carrier on a monthly basis. The allocated amount is thereafter adjusted from time to time to reflect any changes to the defense budget and to reflect the number of Insurance Carriers participating in Pulte's defense.

21. In addition to tendering the case to the Insurance Carriers, Pulte instructed JDi to set up an "open case" in JDi's Vendor Cost Control™ database (the "VCC database"). The VCC database is JDi's flagship product, maintained and operated by JDi, which tracked Insurance Carrier payments, defense costs, payments to law firms, experts and vendors, among other things.

22. Once an "open case" is established, JDi created a matrix with information and Insurance Carrier allocations for the case and assigned a case manager.

23. As part of its cost management, JDi also opened individual trust accounts for each "open case" and JDi's case managers had access to information in the individual Pulte Trust Accounts as part of their case management duties. One of the case managers assigned to Pulte matters was Erwin.

24. As Pulte and GB approved the Insurance Carrier allocations, JDi was solely responsible for sending funding requests to each of the Insurance Carriers. The Insurance Carriers would fulfill these funding requests by paying their allocated share of the defense costs to JDi via check or wire transfer on a monthly basis.

25. Once JDi received the Pulte Insurance Funds from the Insurance Carriers, a critical part of JDi's responsibility was to maintain the funds in the individual Pulte Trust Accounts opened for each claim (or "open case") and disburse funds as needed, when approved by Pulte and GB, to reimburse Pulte for expenses that Pulte had already paid.

26. Once Pulte and GB approved cost invoices, GB issued payments, on behalf of Pulte, to the law firm representing Pulte and other third parties. After making these payments on Pulte's behalf, GB sent funding requests to JDi for reimbursement. GB submitted funding requests to JDi every 30-45 days, generally on Fridays.

27. Upon receipt of the funding request from GB, JDi generally made the requested payments to GB by Tuesday of the following week.

28. In order for JDi to keep track of and reconcile the case expenditures, Pulte granted JDi access to Legal Tracker (formerly Serengeti), a software program used by Pulte to manage litigation matters, invoices, budgets, status reports, and documents from outside law firms. For the applicable "open cases", JDi pulled invoices from Pulte's legal defense firms, experts and other third-party vendors housed in Legal Tracker and uploaded them to the VCC database. JDi also uploaded to the VCC database all payments made by GB to third parties.

29. At the end of a case, either the law firm or GB notified JDi to issue a final billing, or, if applicable, to refund any excess funds to the Insurance Carriers.

30. JDi was solely responsible for maintaining communications with the Insurance Carriers and opening and maintaining funds in the segregated Pulte Trust Accounts.

31. JDi was also responsible for reconciling incoming funds received from the Insurance Carriers and outgoing payments issued by GB to Pulte's outside defense firms, experts and other third parties.

32. JDI was further responsible for reconciling the Pulte Trust Account balances with the Pulte Insurance Funds held in each of the individual trust accounts.

33. In addition to managing the costs of open construction defect claims, JDi also provided "Incident Tracking" services. Incident Tracking generally occurred when Pulte received notice of a pre-suit matter.

34. The process of handling an incident tracking matter was generally the same as the process for handling "open cases." If no activity occurred within eight months, JDi would close the incident.

35. JDi also handled another category of matters called "Incident Recovery" matters. This type of matter generally entailed the payment of indemnity monies to Pulte in connection with a construction defect lawsuit.

36. JDi received indemnity funds via check or wire transfer from law firms. JDI was required to deposit those funds into the individual Pulte Trust Accounts at the bank, like it was required to do with any incoming funds from the Insurance Carriers. JDi would then set up an incident recovery case in the VCC Database and enter all transactions in the case as set forth in law firm ledgers provided to JDi.

37. Upon request from GB, JDi processed indemnity payments to GB via check or wire transfer, and those funds would then be paid to Pulte in order to resolve a particular construction defect claim.

38. In all matters, JDi was responsible for reconciliations of all monies going in and out of the trust accounts maintained by JDi for Pulte's benefit.

39. JDi maintained and provided to Pulte various reports, including weekly trust balance reports setting forth various information, including case name, assigned GB adjuster,

assigned JDi case manager, trust balances and expenses paid (the "Trust Balance Reports"). JDi provided the Trust Balance Reports to Pulte as an accounting of the weekly trust activity for the various litigation administrative claims managed by JDi.

40. The last weekly Trust Balance Report sent by JDi to Pulte was dated May 3, 2022. According to JDi, as of May 3, 2002, there were 200 active Pulte matters (open, incident recovery and incident tracking cases) with a total trust balance of $2,654,098.

**B. Defendants' wrongful acts**

41. On or about March 31, 2022, DeRosa contacted Pulte's VP of Risk Management, Ben Waggoner, to schedule a virtual meeting with him. At that meeting, which occurred on or about April 5, 2022, DeRosa confessed to Mr. Waggoner that DeRosa had been siphoning funds out of each of the individual Pulte Trust Accounts to fund JDi's operations for the past six to seven years.

42. DeRosa admitted that the Pulte Insurance Funds JDi held on Pulte's behalf had been moved in and out of the Pulte Trust Accounts for JDi's operational purposes. DeRosa claimed that JDi had a "liquidity issue," and further advised that JDi could no longer fund the Pulte Trust Accounts.

43. Based on Pulte's preliminary investigation of its trust accounts, an investigation that is ongoing, Pulte believes that at least $2,654,098 (the amount reported by JDi in the May 3, 2022 report) of Pulte Insurance Funds entrusted to JDi pursuant to its third party cost administration obligations under the Agreement were wrongfully diverted and misappropriated by JDi over a substantial period of time.

44. Prior to May 2019, JDi, at the direction of DeRosa, wrongfully transferred Pulte Insurance Funds from the individual Pulte Trust Accounts to JDi's operating accounts to fund operational shortfalls, payroll, or monies due to be paid by JDi for other non-Pulte matters.

45. Beginning in or around May 2019, JDi, at the direction of DeRosa, opened a holding account (the "JDi Holding Account") into which JDi transferred all of the Pulte Insurance Funds from the individual Pulte Trust Accounts. JDi then used the commingled funds in the JDi Holding Account to cover operational shortfalls, payroll, and personal expenses, among other activity.

46. JDi's consolidation of all of the Pulte Insurance Funds into the JDi Holding Account allowed JDi much easier access to the Pulte Insurance Funds and enabled it to move money in and out of that account to pay for expenses wholly unrelated to Pulte's matters.

47. At all pertinent times, Wolczanski was the Chief Executive Officer and/or Chief Financial Officer of JDi. As part of his job responsibilities, Wolczanski was in charge of JDi's accounting and other financial affairs. Wolczanski was also an account signatory or holder on at least one of the JDi corporate accounts, which received funds unlawfully taken from the Pulte Trust Accounts.

48. As an account signatory, Wolczanski had knowledge of the unlawful trust fund activities occurring among the Pulte Trust Accounts, JDi's Holding Account, JDI's operating accounts, and other accounts, and, as an officer of JDi, substantially assisted JDi in making these unlawful transactions.

49. Pulte never authorized the transfer of the Pulte Insurance Funds to JDi's Holding Account or any other accounts. These transfers were part of JDi and DeRosa's unlawful efforts to facilitate their misappropriation of the Pulte Insurance Funds.

50. After May 2019, the individual Pulte Trust Accounts generally had a balance of $0.

51. JDi actively concealed its illegal activity by providing weekly Trust Balance Reports showing positive balances in each of the Pulte Trust Accounts, even though each trust account, in truth, had a $0 balance.

52. According to JDi's weekly Trust Balance Report as of April 5, 2022, Pulte active cases had a total trust balance of $2,343,181. As of May 3, 2022, there was a purported trust balance of $2,654,098. However, none of the funds indicated in these reports were actually in the individual Pulte Trust Accounts.

53. JDi routinely swept the Pulte Trust Accounts, emptying all of the trust account balances into the JDi Holding Account and moving funds back and forth as needed for disbursements.

54. Even though the April 5, 2022 reported a total trust balance of $2,654,098, each account had a $0 balance.

55. Beginning on April 1, 2022, JDi failed to disburse funds on open cases in response to weekly funding requests by GB as required under the Agreement.

56. On April 7, 2022, Pulte sent a notice of termination of the Agreement and demanded an immediate replenishment of all funds into the Pulte Trust Accounts in the amounts indicated in JDI's April 5, 2022 weekly Trust Balance Report, as well as replenishment of any other shortfalls not disclosed to Pulte by JDi.

57. On April 18, 2022, GB requested funds in the total sum of $632,203.62 for certain of the open cases. JDi acknowledged receipt of the request and advised that the request would be forwarded to DeRosa. *See* **Composite Exhibit "2"**.

58. On April 20, 2022, GB sent another funding request in connection with another open matter in the sum of $10,555.90. JDi acknowledged receipt of the request and advised the request would be forwarded to DeRosa. *See* **Composite Exhibit "3"**.

59. JDi did not otherwise respond to the requests, and failed to pay the requested sums as required under the Agreement.

60. Pulte has suffered, and continues to suffer, damages as a result of JDi and DeRosa's misappropriation of the Pulte Insurance Funds and the wrongful acts of the other Defendants.

61. All conditions precedent to the initiation of this action have been performed, have occurred, or have been waived or excused.

62. Pulte has retained the services of Bilzin Sumberg Baena Price & Axelrod LLC to represent it in this lawsuit, and is obligated to pay said firm a reasonable fee for such services.

## COUNT I - BREACH OF THE OE AGREEMENT
(Against JDi)

63. Pulte incorporates by reference paragraphs 1 through 62 above, as if fully set forth herein.

64. As part of its duties under the Agreement, JDi was contractually obligated to timely disburse to GB trust account funds upon request as reimbursement of expenses paid by GB in Pulte cases.

65. JDi was also contractually obligated to perform its services "in a good workmanlike manner, by competent personnel, and in accordance with applicable professional standards."

66. By diverting and misappropriating funds, JDi materially breached its obligations under the Agreement by, *inter alia*, failing to fulfill the funding requests as required under the Agreement and failing to perform its services in a good workmanlike manner, by competent personnel, and in accordance with applicable professional standards.

67. Pulte has suffered, and continues to suffer, damages as a result of JDi's material breaches of the Agreement.

68. Pursuant to Paragraph 14 of the Agreement, JDi agreed as follows:

**DEFENSE AND INDEMNIFICATION**. To the fullest extent permitted by law, JDi Data shall defend, indemnify and hold Pulte, its parent companies, subsidiaries, partners, and affiliates harmless from and against any and all damages, loss, expense, lines, claims, demands, and character resulting from or arising out of or in any way connected with the SERVICES provided by JDi Data.

69. Therefore, Pulte is entitled to indemnification for all damages and losses connected in any way with the services provided by JDi.

70. Moreover, Pulte is entitled to recover its attorneys' fees and costs incurred in connection with this litigation, pursuant to Paragraph 13 of the Agreement.

WHEREFORE, Pulte demands judgment against JDi, seeking indemnification of all damages arising directly or indirectly from JDi's breaches pursuant to Paragraph 14 of the Agreement, pre-judgment interest, post-judgment interest, attorneys' fees and costs pursuant to Paragraph 13 of the Agreement, and such further relief as this Court deems just and proper.

## COUNT II - CONVERSION
*(Against JDi and DeRosa)*

71. Pulte incorporates by reference paragraphs 1 through 62 above, as if fully set forth herein.

72. Beginning in 2015, JDi was entrusted to maintain in separate trust accounts the Pulte Insurance Funds for Pulte's benefits.

73. From approximately 2018 through 2022, JDi and DeRosa, without Pulte's knowledge or consent, transferred the Pulte Insurance Funds from the individual Pulte Trust Accounts to the JDi Holding Account, thereby depriving Pulte of the Pulte Insurance Funds.

74. JDi and DeRosa wrongfully obtained and misappropriated in excess of $2.6 million that were held in the Pulte Trust Accounts that were rightfully the property of Pulte.

75. Pulte has been, and continues to be, damaged as a direct and proximate result of JDi's and DeRosa's conversion of its property.

WHEREFORE, Pulte demands judgment against JDi and DeRosa for compensatory damages, punitive damages, pre-judgment interest, and post-judgment interest, and such further relief as this Court deems just and proper.

### COUNT III – BREACH OF FIDUCIARY DUTY
*(Against JDi and DeRosa)*

76. Pulte incorporates by reference paragraphs 1 through 62 above, as if fully set forth herein.

77. By virtue of their position as holders and managers of the Pulte Insurance Funds, which were held in the Pulte Trust Accounts, JDi and DeRosa owed a fiduciary duty to Pulte to protect and safeguard those funds.

78. JDi and DeRosa knowingly used and exploited their position of trust to misappropriate the Pulte Insurance Funds for their own benefit.

79. As a result of these acts, JDi and DeRosa intended to and did permanently deprive Pulte of its right to or benefits from such trust funds, and appropriate such funds to their own use. As a result, Pulte has been, and continues to be, damaged.

WHEREFORE, Pulte demands judgment against JDi and DeRosa for compensatory damages, punitive damages, pre-judgment interest, and post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(Against Wolczanski and Erwin)

80. Pulte incorporates by reference paragraphs 1 through 62 above, as if fully set forth herein.

81. By virtue of their position as holders and managers of the Pulte Insurance Funds, which were held in the Pulte Trust Accounts, JDi and DeRosa owed a fiduciary duty to Pulte safeguard and protect those funds.

82. JDi breached its fiduciary duty to Pulte by converting millions of dollars of Pulte Insurance Funds for its own personal use.

83. By virtue of his access and administration of the trust accounting, and as the CEO and CFO of JDi, Wolczanski knew or should have known that JDi and DeRosa had converted the Pulte Insurance Funds by sweeping the Pulte trust accounts into the JDi Holding Account. Wolczanski was also an account signatory for at least one of JDi's corporate accounts receiving the misappropriated funds.

84. Wolczanski provided substantial assistance to JDi and DeRosa in their breach of fiduciary duty by facilitating the trust transactions despite knowing that the Pulte Insurance Funds were improperly being used by JDi and DeRosa for unauthorized business and personal purposes, and despite knowing that these transactions were contrary to JDi and DeRosa's obligations under the Agreement.

85. Wolczanski also provided substantial assistance by being a signatory on at least one of the accounts, which received funds from the Pulte Trust Accounts.

86. Erwin provided substantial assistance to JDi and DeRosa in their breach of fiduciary duty. As case manager, Erwin knew, or reasonably should have known, that the weekly

14

Trust Balance Reports contained false information, which was provided to Pulte to conceal JDi and DeRosa' breach of fiduciary duty.

87. Wolczanski and Erwin aided and abetted JDi and DeRosa in their breach of fiduciary duty and in doing so, proximately caused damages to Pulte.

WHEREFORE, Pulte demands judgment Wolczanski and Erwin for actual damages, pre-judgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT V – GROSS NEGLIGENCE
(Against Erwin)

88. Pulte incorporates by reference paragraphs 1 through 62 above, as if fully set forth herein.

89. Erwin was involved in the day-to-day handling of Pulte's Trust Accounts. Given her day-to-day involvement with these accounts, Erwin knew, or should have known, of the unlawful transfer and use of funds described above.

90. Erwin managed Pulte's cases in a manner that was so reckless or wanting in care, as to constitute or manifest a conscious disregard of the consequences of the wrongful transfer and use of the Pulte Insurance Funds.

91. As a direct, proximate and foreseeable result of Erwin's conscious disregard of the converted use of the Pulte Insurance Funds, Pulte has been, and continues to be, damaged.

WHEREFORE, Pulte demands judgment against Erwin for actual damages, punitive damages, pre-judgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## **COUNT VI – FRAUD**
(Against DeRosa and JDi)

92.     Pulte incorporates by reference paragraphs 1 through 62 above, as if fully set forth herein.

93.     DeRosa caused JDi to prepare false and fraudulent Trust Balance Reports, which reflected that JDi held the Pulte Insurance Funds in separate trust accounts.

94.     DeRosa, knowing that JDi had commingled all of the Pulte Insurance Funds into the JDi Holding Account, caused JDi to deliver the false Trust Balance Reports to Pulte with the intention that Pulte rely on the statements to continue using JDi as its claims management agent.

95.     DeRosa knew the trust account statements were false when they were prepared and delivered to Pulte.

96.     As a result of the false Trust Balance Reports, Pulte was, and continues to be, damaged.

WHEREFORE, Pulte demands judgment against JDi and DeRosa for actual damages, punitive damages, pre-judgment interest, post-judgment interest, and such further relief as this Court deems just and proper.


DATED this 19th day of January, 2022.

## JURY TRIAL DEMAND

Pulte demands a trial by jury of all issues so triable.

Respectfully submitted,

By: /s/ Philip R. Stein
Philip R. Stein, Fla. Bar No. 67278
Enza G. Boderone, Fla. Bar. No. 0792411
Jake Greenberg, Fla. Bar No. 91118
**Bilzin Sumberg Baena Price & Axelrod**
1450 Brickell Ave., Ste. 2300
Miami, FL 33131
Tel.: (305) 374-7580
Fax: (305) 374-7593
pstein@bilzin.com
eboderone@bilzin.com
jgreenberg@bilzin.com
ekravets@bilzin.com
eservice@bilzin.com